**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| THOMAS LEE GOLDSTEIN, *Plaintiff-Appellant*, v. CITY OF LONG BEACH; JOHN HENRY MILLER, in his individual and official capacity; WILLIAM COLLETTE, in his individual and official capacity; LOGAN WREN, in his individual and official capacity; WILLIAM MACLYMAN, in his individual and official capacity, *Defendants*, and COUNTY OF LOS ANGELES, *Defendant-Appellee*. | No. 10-56787 D.C. No. 2:04-cv-09692-AHM-E OPINION |

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
November 8, 2012—Pasadena, California

Filed May 8, 2013

Before: Stephen Reinhardt and Sidney R. Thomas, Circuit Judges, and Gloria M. Navarro, District Judge.[*]

Opinion by Judge Thomas;
Concurrence by Judge Reinhardt

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's grant of a motion for judgment on the pleadings, entered following a decision by the United States Supreme Court, and held that the County of Los Angeles could be liable pursuant to 42 U.S.C. § 1983 because the district attorney acted as final policymaker for the County when adopting and implementing internal polices and procedures related to the use of jailhouse informants.

Plaintiff spent 24 years in prison after being convicted for murder based largely upon the perjured testimony of unreliable jailhouse informant Edward Fink. He was released after the district court determined that Fink had lied and that it might have made a difference if the prosecution had told plaintiff's lawyer that Fink had received prior rewards in return for favorable testimony. Subsequently, in plaintiff's § 1983 case, the Supreme Court held that the Los Angeles

---

[*] The Honorable Gloria M. Navarro, District Judge for the U.S. District Court for the District of Nevada, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

County district attorney and chief deputy district attorney were absolutely immune from plaintiff's claims that the prosecution failed to disclose impeachment material due to a failure to properly train prosecutors, failed to properly supervise prosecutors, and failed to establish an information system containing potential impeachment material about informants. *Van de Kamp v Goldstein*, 555 U.S. 335, 339 (2009). On remand, the district court, among other things, granted the County's motion for judgment on the pleadings.

Reversing the district court, the panel held that the Los Angeles County District Attorney represents the County when establishing administrative policies and training related to the general operation of the district attorney's office, including the establishment of an index containing information regarding the use of jailhouse informants. Therefore, a cause of action may lie against the County under § 1983.

Judge Reinhardt concurred with the opinion and wrote separately to emphasize the problems related to the eponymous and notorious Edward Fink and to explain why he found unpersuasive the California Supreme Court's reasoning in *Pitts v. County of Kern*, 949 P.2d 920, 923 (Cal. 1998) (holding that the district attorney represents the state, not the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas).

## COUNSEL

Barrett S. Litt and Lindsay B. Battles, Litt, Estuar & Kitson, LLP, Los Angeles, California, for Plaintiff-Appellant.

Tomas A. Guterres and Catherine M. Mathers, Collins Collins Muir + Stewart LLP, South Pasadena, California; Timothy T. Coates and Cynthia E. Tobisman, Greines, Martin, Stein & Richland LLP, Los Angeles, California, for Defendant-Appellee.

## OPINION

THOMAS, Circuit Judge:

We consider in this case whether a district attorney acts as a local or a state official when establishing policy and training related to the use of jailhouse informants. We find that, as to the policies at issue here, the district attorney was acting as a final policymaker for the County of Los Angeles. We thus reverse the district court's grant of the motion for judgment on the pleadings and remand the case.[1]

## I

Thomas Goldstein spent 24 years in prison after being convicted for murder based largely upon the perjured testimony of an unreliable jailhouse informant, the aptronymic Edward Fink. *Van de Kamp v Goldstein*, 555 U.S. 335, 339 (2009); *see also Thompson v. Calderon*,

---

[1] Appellant's motion for judicial notice is GRANTED.

120 F.3d 1045, 1053-1054 (9th Cir. 1997) (describing Fink as a "perennial informant," and describing his exploits in some detail), *rev'd*, 523 U.S. 538 (1998).

Fink was a heroin addict and convicted felon who had previously received reduced sentences by testifying in other cases and received a reduced sentence in exchange for his testimony against Goldstein. *Goldstein v. Superior Court*, 195 P.3d 588, 590 (Cal. 2008). Some prosecutors in the Los Angeles County District Attorney's office allegedly knew about Fink's history, but failed to inform the prosecutors trying Goldstein's case or Goldstein's counsel that Fink had testified before or that he received a benefit for testifying against Goldstein, and Fink lied on the stand when he was asked about previous assistance given or benefits received. *Van de Kamp*, 555 U.S. at 339.

Goldstein was convicted almost solely on the basis of Fink's testimony. The California Supreme Court explained the evidence against Goldstein:

> In 1979 Goldstein was an engineering student and Marine Corps veteran with no criminal history. He became a murder suspect after an eyewitness to an unrelated shooting saw the gunman enter Goldstein's apartment building. No witness or forensic evidence connected Goldstein with the murder victim, but Long Beach police detectives showed Goldstein's photograph, among others, to Loran Campbell, an eyewitness to the homicide. Campbell did not recognize anyone in the photo lineup, and Goldstein did not match Campbell's description of the suspect.

> However, a detective asked if Goldstein could have been the person Campbell saw running from the scene. Campbell said it was possible, though he was not certain.
>
> Goldstein was arrested and placed in a jail cell with Edward Floyd Fink, a heroin addict and convicted felon. At Goldstein's trial, Fink testified that Goldstein said he was in jail because he shot a man in a dispute over money.

*Goldstein v. Superior Court*, 195 P.3d 588, 590 (Cal. 2008). Campbell later recanted his identification of Goldstein, leaving Fink's testimony as the basis for the conviction. *Id.*

In 1998, Goldstein filed a habeas petition in the Central District of California. *Van de Kamp*, 555 U.S. at 339. At an evidentiary hearing, the district court agreed that Fink had lied and that it might have made a difference "if the prosecution had told Goldstein's lawyer that Fink had received prior rewards in return for favorable testimony[.]" *Id.* at 339. The court ordered the state to grant Goldstein a new trial or release him, and the Court of Appeals affirmed. *Id.* The state decided to release Goldstein, who had already served 24 years of his sentence. *Id.*

Goldstein then filed this action under 42 U.S.C. § 1983. *Id.* at 340. As relevant here, Goldstein claims that the Los Angeles County District Attorney's Office failed to create any system for the Deputy District Attorneys handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information, and failed to train Deputy District Attorneys to

disseminate this information. Goldstein explains that the district attorney's office was on notice that jailhouse informants were falsely testifying and considered the creation of a system to track benefits provided jailhouse informants and other impeachment information, but failed to create any system.

In 2009, the United States Supreme Court addressed whether the Los Angeles County district attorney and chief deputy district attorney had absolute immunity from suit for Goldstein's claims. While the Supreme Court "agree[d] with Goldstein that, in making these claims, he attack[ed] the office's administrative procedures," it concluded that "[t]hose claims focus upon a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial." *Van de Kamp*, 555 U.S. at 344. Therefore, the Court held that the Los Angeles County district attorney and chief deputy district attorney were absolutely immune from Goldstein's claims that the prosecution failed to disclose impeachment material due to a failure to properly train prosecutors, failed to properly supervise prosecutors, and failed to establish an information system containing potential impeachment material about informants. *Id.* at 339.

On remand, the district court entered judgment in favor of Los Angeles County district attorney John Van de Kamp and chief deputy district attorney Curt Livesay.[2] As to the County of Los Angeles' motion for judgment on the pleadings, the district court explained that this Court has not had occasion

---

[2] The district court had also dismissed with prejudice claims against Long Beach, California defendants the City of Long Beach, John Henry Miller, William Collette, and William MacLyman based on a settlement between those parties and Goldstein.

to address the claims at issue here, but "reluctantly concluded" that the district attorney acts on behalf of the state, rather than the county, in setting policy related to jailhouse informants "in light of *Weiner* [*v. San Diego County*, 210 F.3d 1025 (9th Cir. 2000)] and the two decisions of [the Northern District of California] construing it." Therefore, the district court granted the County of Los Angeles' motion for judgment on the pleadings.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review an order granting a motion for judgment on the pleadings de novo. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012). For purposes of our review, "[a]ll material allegations in a complaint must be taken as true and viewed in the light most favorable to the plaintiff." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003).

## II

"Pursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority concerning the action . . . at issue and (2) was the policymaker for the local governing body for the purposes of the particular act." *Id.* at 1028 (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997)). States and state officials acting in their official capacities cannot be sued for damages under Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989);

*see Ceballos v. Garcetti*, 361 F.3d 1168, 1183 n.11 (9th Cir. 2004).

Here, all parties agree that the district attorney is the relevant policymaker. Thus, the viability of Goldstein's claim turns on whether the Los Angeles District Attorney acted here as a policymaker for the state or for the county. This determination is made on a function-by-function approach by analyzing under state law the organizational structure and control over the district attorney. *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 785–86 (1997).

**A**

In *McMillian*, the Supreme Court first set out the procedure to determine whether a policymaker acts on behalf of the state or local government. The case involved the sheriff of Monroe County, Alabama, and the Court sought to determine whether he acted as a state or local official when intimidating a witness into making false statements and suppressing exculpatory evidence. 520 U.S. at 784. The Court was clear that the inquiry is not undertaken in a "categorical, 'all or nothing' manner," but rather that the "cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *Id.* at 785 (citations omitted).

The Court explained that the "inquiry is dependent on an analysis of state law." *Id.* at 786. It looked first to the Alabama Constitution, and concluded that "the constitutional provisions concerning sheriffs, the historical development of those provisions, and the interpretation given them by the Alabama Supreme Court strongly support Monroe County's

contention that sheriffs represent the State, at least for some purposes." *Id.* at 787. Alabama had taken specific steps both in its Constitution and statutes to increase state control over sheriffs and move the authority to impeach sheriffs "from the county courts to the State Supreme Court, because of the failure of county courts to punish officers for neglect of duty." *Id.* at 788 (citation and alterations omitted).

When looking to Alabama's statutes, the Supreme Court explained that sheriffs must "attend upon" state courts in the county, "obey the lawful orders and directions" of state courts, and "execute and return the process and orders of any state court, even those outside his county." *Id.* at 789 (internal quotation marks and citation omitted). "[T]he presiding circuit judge exercise[s] a general supervision over the county sheriffs in his circuit, just as if the sheriffs are normal court [*i.e.*, state] employees." *Id.* at 790 (alterations in original) (internal quotation marks and citation omitted). "[M]ost importantly," the Court explained, "sheriffs are given complete authority to enforce the state criminal law in their counties" and must report evidence of crimes to the district attorney (who is, in Alabama, a state official), while the counties have no powers of law enforcement. *Id.* The governor and attorney general can "direct the sheriff to investigate any alleged violation of law in their counties," and the sheriff must "promptly" complete the investigation and write a report to the state official. *Id.* at 791 (internal quotation marks and citations omitted). Finally, the Court noted that "the salaries of all sheriffs are set by the state legislature, not by the county commissions." *Id.* (citation omitted).

On the other hand, the Supreme Court explained that "the sheriff's salary is paid out of the county treasury,"[3] "the county provides the sheriff with equipment (including cruisers)," "the sheriff's jurisdiction is limited to the borders of his county," and "the sheriff is elected locally by the voters in his county."  *Id.* (internal quotation marks and citation omitted).  The Court noted but found "little merit" in the fact that the county coroner fills temporary vacancies in the sheriff's office, the sheriff is indicated in the code among "county officials" or "county employees," and that the Monroe County Commission's insurance policy may cover "some, but not all" of the claims against the Sheriff in this case.  *Id.* at 792 n.7.  The Court "d[id] not find these provisions sufficient to tip the balance in favor of petitioner" because the county commission's influence over the sheriff's operations was only "attenuated and indirect."  *Id.* at 792.

Therefore, the Supreme Court concluded that "the weight of the evidence is strongly on the side of the conclusion" that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." *Id.* at 793.

**B**

Based on our analysis of the relevant California constitutional and statutory provisions, we conclude that California district attorneys act as local policymakers  when

---

[3] The county was not able to change the sheriff's salary or refuse to pay him, though it could "deny funds . . . beyond what is reasonably necessary."  *McMillian*, 520 U.S. at 791 (internal quotation marks and citation omitted).

adopting and implementing internal policies and procedures related to the use of jailhouse informants.

We begin by examining district attorneys' place within the structure of government, and then by looking at the constitutional and statutory provisions relevant to power and duties of district attorneys within their counties, as well as the control the California Attorney General and the county boards of supervisors exercise over them. Our task, of course, is not merely to weigh the amount of control that the Attorney General and county board of supervisors possess over a district attorney; instead, we must decide whether the district attorney was acting *on behalf of* the state or the county.

As to governmental structure, "[t]he officers of a county [include] [a] district attorney." Cal. Gov. Code § 24000. This is also reflected in Article XI of the California Constitution, "Local Government," under which "[t]he Legislature shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county." Cal. Const. art. XI, § 1(b). Additionally, a district attorney must be a registered voter of the county in which he or she is elected, Cal. Gov. Code § 24001, and is elected by the voters of the county, Cal. Gov. Code § 24009. A district attorney may be removed from office by the same procedure as for other city and county officials. Cal. Gov. Code § 3073.

Though these structural provisions provide a helpful starting point for our analysis, the state's label of the district attorney as a county official informs but of course cannot determine the result of our functional inquiry. *See McMillian*, 520 U.S. at 792 n.7 (finding "little merit" in the fact that the sheriff is indicated in the code among "county

officials" or "county employees"). For our more specific inquiry, we focus on district attorneys' roles vis-a-vis the state Attorney General and the county board of supervisors.

First, Article V, Section 13 of the California Constitution states:

> Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State. It shall be the duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced. The Attorney General shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or directed by

> the Governor, the Attorney General shall
> assist any district attorney in the discharge of
> the duties of that office.

Cal. Const. art. V, § 13.

We have already analyzed Article V, Section 13 of the California Constitution as it relates to sheriffs' supervision by the Attorney General, and concluded that despite this provision, sheriffs are county officers for the purposes of investigation. *Brewster v. Shasta Cnty.*, 275 F.3d 803, 805 (9th Cir. 2001). We cautioned that significant "reliance on Article V, section 13, would prove too much." *Id.* at 809. "Under this provision, if taken to its logical extreme, *all* local law enforcement agencies in California would be immune from prosecution for civil rights violation, thereby rendering meaningless the decision in *Monell*, which preserves § 1983 actions against local governments." *Bishop Paiute Tribe v. Cnty. of Inyo*, 291 F.3d 549 (9th Cir. 2002), *vacated on other grounds by Inyo Cnty. v. Paiute-Shoshone Indians*, 538 U.S. 701 (2003). Instead, "[s]uch general law enforcement authority 'does not contemplate absolute control and direction' of the officials subject to the Attorney General's supervision." *Brewster*, 275 F.3d at 809 (citing *People v. Brophy*, 120 P.2d 946, 953 (Cal. Ct. App. 1942) ("[I]t is at once evident that "supervision" does not contemplate control . . . .")); *see also Pitts v. Cnty. of Kern*, 949 P.2d 920, 939 (Cal. 1998) (Mosk, J., dissenting) (explaining that *Brophy*'s analysis of the California Constitutional provision "is still good law").[4]

---

[4] A contrary conclusion here that the district attorney here acts on behalf of the state would be in tension with *Brewster*, given our conclusion there that the sheriff acts on behalf of the county when conducting

Though the Attorney General "shall have direct supervision over every district attorney and sheriff," the Attorney General's control over the district attorney is quite limited: he or she is limited to requiring a district attorney to "make reports." Cal. Const. art V, § 13; *see* Cal. Gov. Code § 12550. The Attorney General may also "call into conference the district attorneys" "for the purpose of discussing the duties of their respective offices." Cal. Gov. Code § 12524. This falls far short of a power to dictate policy to district attorneys statewide, and is in contrast to the sheriffs' role in *McMillian* in which the governor and attorney general could "direct the sheriff to investigate any alleged violation of law in their counties," and the sheriff had to "promptly" complete the investigation and write a report to the state official. *McMillian*, 520 U.S. at 791 (internal quotation marks and citations omitted).

Further, unlike in *McMillian*, there was no significant constitutional or statutory change that makes clear a trend to place district attorneys under state control. *See id.* at 788. Instead, when Article V, Section 13 was proposed in 1934, it had as its goal efficiency and horizontal coordination, rather

---

investigations even though the Attorney General has much greater supervisory power over sheriffs than district attorneys. *Compare* Cal. Gov. Code § 12560 ("Whenever [the Attorney General] deems it necessary in the public interest *he shall direct* the activities of any sheriff relative to the investigation or detection of crime within the jurisdiction of the sheriff. . . ." (emphasis added)) *with* Cal. Gov. Code § 12550 ("When [the Attorney General] deems it advisable or necessary in the public interest, or when directed to do so by the Governor, *he shall assist* any district attorney in the discharge of his duties . . . ." (emphasis added)). This is in contrast to the many provisions of the California Code that treat sheriffs and district attorneys identically. *See, e.g.*, Cal. Gov. Code §§ 12524, 24000, 24001, 25300, 25303, 29601.

than a desire to weaken district attorneys or give the Attorney General additional power. *See* 1934 Proposed Amendments to Constitution, Propositions and Proposed Laws at 9 ("[T]he manner in which the Dillingers, the 'Baby Face' Nelsons, the Machine Gun Kellys, the Tuohys [sic] and numerous other criminal gangs have been playing hide and seek with the public authorities has truly became [sic] a National disgrace."). Additionally, district attorneys were added to the list of county officials in a 1986 Amendment, which shows that the most recent trend in California is to confirm the district attorney's place as a county officer. *See* Cal. Const. Art. XI, § 1(b), historical notes.

If the Attorney General believes a district attorney is not adequately prosecuting crime, the Attorney General is not given the power to force a district attorney to act or adopt a particular policy, but instead may step in and "prosecute any violations of law" himself or herself. Cal. Const. art V, § 13; *see* Cal. Gov. Code § 12550. The Attorney General may also, "with or without the concurrence of the district attorney, direct the grand jury to convene" and "may take full charge of the presentation of the matters to the grand jury . . . ." Cal. Penal Code § 923(a). The power to act in place of a district attorney is undoubtedly less than if the Attorney General could force a district attorney to use his or her own time and resources to act.

If the Attorney General does step in to conduct a prosecution, "in such cases the Attorney General shall have all the powers of a district attorney," Cal. Const. art V, § 13, which suggests that the Attorney General does not have those powers unless and until he or she steps in to conduct a particular prosecution himself or herself. Finally, the Attorney General is given the power to "assist the district

attorney in the discharge of the duties of that office," Cal. Const. art V, § 13, but this similarly does not suggest control over or the power to mandate that a district attorney adopt a particular policy.

Outside of conducting criminal prosecutions, the Attorney General's power is even more attenuated: California authority indicates that district attorneys act on behalf of the county and are under the general control of the county board of supervisors. "The board of supervisors shall supervise the official conduct of all county officers," including the district attorney, and the district attorney's use of public funds. Cal. Gov. Code § 25303. As did the state in *McMillian*, the county board of supervisors "exercise[s] a general supervision over the" district attorney, and for most purposes, district attorneys are treated as "normal" county employees. *See McMillian*, 520 U.S. at 790 (alterations in original).

The fact that the board of supervisors' control "shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a county," Cal. Gov. Code § 25303, does not change this conclusion. As we have previously explained when analyzing this provision as to the sheriff, this limitation seeks to insulate the sheriff and district attorney "from political pressure." *Brewster*, 275 F.3d at 809. "The provision thus is akin to a separation of powers provision, and as such has no obvious bearing on whether [they] should be understood to act for the state or the county. . . . Merely because a county official exercises certain functions independently of other political entities within the county does not mean that he does not act *for* the county." *Id.* at 810. Therefore, even though the board of supervisors does not exercise complete control over the district attorney, that

does not mean that the district attorney was not acting on behalf of the county here.

Other provisions indicating that the district attorney here acts on behalf of the county include that the district attorney is paid "out of the county treasury," Cal. Gov. Code § 28000, and the board of supervisors "shall prescribe the compensation" of the district attorney, Cal. Gov. Code § 25300; *cf. McMillian*, 520 U.S. at 791 ("[T]he salaries of all sheriffs are set by the state legislature, not by the county commissions."). Necessary expenses incurred "in the prosecution of criminal cases" are "county charges," Cal. Gov. Code § 29601, the district attorney must "account for all money received by him in his official capacity and pay it over to the treasurer" of the county board of supervisors. "The district attorney shall render legal services to the county without fee," Cal. Gov. Code § 26520; is the "legal adviser" for the county if there is no county counsel, Cal. Gov. Code § 26526; cannot "in any way advocate" against the county, Cal. Gov. Code § 26527; and may defend the county against the State of California in a state eminent domain proceeding, Cal. Gov. Code § 26541.

Finally, counties are required to defend and indemnify the district attorney in an action for damages. Cal. Gov. Code §§ 815.2, 825. The county's obligation to defend and indemnify the district attorney in an action for damages is a "crucial factor [that] weighs heavily[.]" *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 562 (9th Cir. 2001) (citation omitted). In *McMillian*, the Court explained that the state's responsibility for judgments against the sheriff was "critical" for the case and "strong evidence in favor of the . . . conclusion that sheriffs act on behalf of the State." *McMillian*, 520 U.S. at 789.

**C**

In addition to constitutional and statutory provisions, the practical treatment of the policies Goldstein addresses supports the conclusion that this is a local, not statewide, determination. In 1988, a jailed informant demonstrated on *60 Minutes* how easy it was to concoct a plausible "confession" to a crime by a prisoner he had never even met; in part because of this demonstration, a Los Angeles County Grand Jury convened to conduct "intensive investigation" and heard testimony from 120 witnesses about the use of jailhouse informants in Los Angeles County. Report of the 1989–90 Los Angeles County Grand Jury, *Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County* 1–2 (1990), *available at* http://www.ccfaj.org/documents/reports/jailhouse/expert/1989-1990%20LA%20County%20Grand%20Jury%20Report.pdf.

The report it issued in 1990 recommended that the Los Angeles County "District Attorney's Office should maintain a central file which contains all relevant information regarding the informant," *id.* at 149, which that District Attorney's Office has now done. *See* Steve Cooley, Los Angeles County District Attorney's Office, Legal Policies Manual 188 (April 2005), *available at* http://www.ccfaj.org/documents/reports/jailhouse/expert/LACountyDApolicies.pdf.

In 2004, a California State Senate Resolution created the California Commission on the Fair Administration of Justice, which was asked to "make any recommendations and proposals designed to further ensure that the application and administration of criminal justice in California is just, fair,

and accurate[.]"      California Commission on the Fair
Administration of Justice, Final Report 186 (2008), *available
at* http://www.ccfaj.org/documents/CCFAJFinalReport.pdf.

The Commission issued its final report in 2008 and made
individualized recommendations about informant testimony
for the legislature, police agencies, prosecutors, judges, and
defense lawyers. *Id.* at 13–14. The report specifically
recommended that "California District Attorney Offices adopt
a written internal policy, wherever feasible, to govern the use
of in-custody informants. The policy should provide [for] the
maintenance of a central file preserving all records relating to
contacts with in-custody informants, whether they are used as
witnesses or not." *Id.* It is instructive that the Committee,
with significant expertise with both district attorneys offices
and state office,[5] specifically recommended that "California
District Attorney Offices" should maintain the central file of
informants, and did not include this among its separate
recommendations for the legislature or suggest that the
Attorney General promulgate a rule. The Commission also
conducted a survey of California county district attorneys,
and of the nine responses the Commission received, only two
offices had a "policy [that] requires the maintenance of a
central file of all informant information." *Id.* at 47. This
similarly suggests that, at least up to this point, district

---

[5] For example, the Chair of the Commission was John K. Van de Kamp,
the Los Angeles County District Attorney at the time Goldstein was
tried and later a two-term Attorney General for the State of California.
*See* California Commission on the Fair Administration of Justice,
Final Report 1 (2008), available at http://www.ccfaj.org/documents/
CCFAJFinalReport.pdf.

attorney office policies related to informants have been addressed by the individual offices rather than by the state.**[6]**

**D**

Taking all of these provisions together, it is clear that the district attorney acts on behalf of the state when conducting prosecutions, but that the local administrative policies challenged by Goldstein are distinct from the prosecutorial act. Most significant is the contrast between the steps that were taken in Alabama to increase the state's control over the sheriff in *McMillian* and the contrary California trend to categorize district attorneys as county officials; the fact that "[t]he board of supervisors shall supervise the official conduct of all county officers," Cal. Gov. Code § 25303; and the fact that the county must defend and indemnify the district attorney in an action for damages, which the Supreme

---

**[6]** We do recognize that the fact that the Attorney General has not required all district attorney offices to adopt a policy creating a central file for informants does not mean that she lacks the power to do so, but we do note that Los Angeles County contends that the Attorney General has much greater power than has ever been exercised. At oral argument, for example, the County explained that the Attorney General has the power to make the decision that no death penalty cases will be prosecuted in the state of California, to require district attorneys offices statewide to maintain an "open-file" policy, or to require that a centralized database for jailhouse informants be adopted. The County offered neither authority for nor examples of an Attorney General establishing policy in this way. The County was also unable to offer and we have been unable to find any example of the Attorney General stepping in to take over a prosecution or dictating any sort of policy to a district attorney's office without a request from the district attorney's office that he or she do so.

Court deemed "critical" in *McMillian*, 520 U.S. at 789; *see* Cal. Gov. Code §§ 815.2, 825. Even taking into account the control and supervisory powers of the Attorney General, the Los Angeles County District Attorney represents the county when establishing administrative policies and training related to the general operation of the district attorney's office, including the establishment of an index containing information regarding the use of jailhouse informants.

### III

The County raises additional arguments. However, on close examination, none is persuasive.

The County's contention that the Supreme Court's conclusion in *Van de Kamp* determines the outcome of this case is incorrect. Though the inquiries of prosecutorial immunity and state or local policymaking may be related, they are separate. The prosecutorial immunity inquiry focuses on "policy considerations which compel civil immunity," *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976), and is a federal question that will have a consistent answer nationwide. *See Howlett v. Rose*, 496 U.S. 356, 383 (1990). The state-local determination under Section 1983, although also a federal question ultimately, depends on a careful and thorough analysis of state constitutional and statutory provisions, and will vary "from region to region, and from State to State." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 795 (1997). In *Van de Kamp*, the Supreme Court did not look to or examine California law, but focused on common-law traditions and policy implications in determining that the district attorney was entitled to absolute immunity.

The County similarly asserts, without citation, that California law conflates the two analyses: district attorneys act as State officials in the same instances that they are protected by absolute prosecutorial immunity. However, the California Supreme Court has explained that it is incorrect to "assume[] that the functions for which a prosecutor may obtain absolute, as opposed to qualified, immunity parallel those for which a district attorney represents the state, as opposed to the county." *Pitts*, 949 P.2d at 935. "[T]hese are in fact separate inquiries." *Id.*; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 474 n.2 (1986) (holding county liable for prosecutor's actions after petitioner had conceded that prosecutor was absolutely immune).

Contrary to the County's argument, our decision in *Weiner* has no bearing on this case. In *Weiner*, we held that a "district attorney act[s] on behalf of the state, not the county, in deciding to prosecute" a person for a crime, but acknowledged that "this is not to say that district attorneys in California are state officers for all purposes. To the contrary, California law suggests that a district attorney is a county officer for some purposes." *Weiner*, 210 F.3d at 1026, 1031. Weiner challenged the prosecutor's decision to retry him for murder after he was granted a new trial. *Id.* at 1027. In concluding that "a county district attorney acts as a state official when deciding whether to prosecute an individual," we focused on the fact that, under California law, "[i]n the prosecution of criminal cases [the district attorney] acts by the authority and in the name of the people of the state." *Id.* at 1030 (citations omitted); *see also* Cal. Gov. Code § 26500. Because we do not address the decision to prosecute an individual, the analysis in *Weiner* does not resolve the question before us today.

Similarly, the County is incorrect that we are bound by the California Supreme Court's determination in *Pitts* that the district attorney acts on behalf of the state for some purposes. Though we must look at the relevant state law and state courts' characterizations of that law, the final determination under 42 U.S.C. § 1983 is a federal law statutory interpretation question; no deference is due to the ultimate conclusion of the California court that the provisions, taken as a whole, indicate the district attorney was a state actor under Section 1983 for any particular function. *See Weiner*, 210 F.3d at 1025. "Although we must consider the state's legal characterization of the government entities which are parties to these actions, federal law provides the rule of decision in section 1983 actions." *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 560 (9th Cir. 2001) (citations omitted). "State law does not control our interpretation of a federal statute." *Id.*; *see also Cortez v. Cnty. of Los Angeles*, 294 F.3d 1186, 1191 (9th Cir. 2002); *Brewster*, 275 F.3d at 811.

Nonetheless, we need not disrupt the California Supreme Court's conclusion because *Pitts* addressed a district attorney function different than the one we confront today. In *Pitts*, the California Supreme Court concluded that "the district attorney represents the state, not the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas." *Pitts v. Cnty. of Kern*, 949 P.2d 920, 923 (Cal. 1998). Pitts alleged that the County and district attorney "established a pattern, custom, and practice of procuring false statements and testimony by threat, . . . bribery, and coercion of witnesses" that "failed to provide adequate training, procedures, guidelines, rules, and regulations to prevent such conduct . . . ." *Id.* at 927. The court noted that it was "not

seeking to make a characterization of [California district attorneys] that will hold true for every type of official activity they engage in," but instead focused on the district attorney's function "when preparing to prosecute and when prosecuting criminal violations of state law, and when training and developing policies for employees engaged in these activities." *Id.* at 928.

The California Supreme Court analyzed the provisions of the California Constitution and the statutes discussed above, and based on these considerations, it concluded that "when preparing to prosecute and when prosecuting criminal violations of state law, a district attorney represents the state and is not a policymaker for the county." *Id.* at 934. That determination is not implicated by Goldstein's claims.

As to training and supervising staff, the California Supreme Court said that based on its conclusion that the district attorney represents the state "when preparing to prosecute and when prosecuting criminal violations of state law," it "further concludes it logically follows that he or she also represents the state, and not the county, when training and developing policy in these areas. No meaningful analytical distinction can be made between these two functions." *Id.* at 935. Separating these two functions would "require impossibly precise distinctions" and would lead to "nonsensical," "arbitrary" results. *Id.*

The *Pitts* Court examined the training and policies that "failed to . . . prevent" the use of "threat, . . . bribery, and coercion of witnesses," *id.* at 927, and the challenged policies were part of the training for district attorneys' preparation of individual witness for particular trials. In *Pitts*, child witnesses were coerced into testifying falsely that the

defendants, their acquaintances or relatives, had sexually abused them. *Id.* at 923. Coerced testimony from the alleged victim of a crime is inextricably linked to the prosecution of that crime.

The function at issue here, on the other hand, is distinguishable from the question confronted by the California Supreme Court because Goldstein challenges administrative policy and accompanying training, rather than prosecutorial training and policy. Goldstein's challenge focuses on the failure to create an index that includes information about benefits provided to jailhouse informants and other previous knowledge about the informants' reliability, and the failure to train prosecutors to use that index. Goldstein alleges that it was the lack of an index that allowed Fink to lie about the benefits he received for testifying against Goldstein, prevented prosecutors in Goldstein's case from knowing Fink's history, and prevented Goldstein's counsel from impeaching Fink.

The conduct at issue here does not involve prosecutorial strategy, but rather administrative oversight of systems used to help prosecutors comply with their constitutional duties. *See Van de Kamp*, 555 U.S. at 344 ("We agree with Goldstein that, in making these claims, he attacks the office's administrative procedures."); *Pitts*, 949 P.2d at 935 ("Our conclusion as to which entity the district attorney represents might differ were plaintiffs challenging . . . some other administrative function . . . ."). In *Pitts*, there was no administrative function involved. There can be a "meaningful analytical distinction" between policies and training relating to prosecutorial functions and an index made and maintained as an administrative matter.

## IV

In sum, we conclude that the policies challenged by Goldstein are distinct from the acts the district attorney undertakes on behalf of the state.  Even taking into account the control and supervisory powers of the Attorney General, the Los Angeles County District Attorney represents the county when establishing policy and training related to the use of jailhouse informants. Therefore, a cause of action may lie against the County under 42 U.S.C. § 1983.  We reverse the judgment of the district court.

**REVERSED AND REMANDED**.

REINHARDT, Circuit Judge, concurring:

I concur fully in Judge Thomas's opinion and write separately to make two points, one brief and one less so.

## I.

Judge Thomas understates the problem with the eponymous and notorious Edward Fink, if that is possible. In the case that Judge Thomas cites, *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc), *rev'd*, 523 U.S. 538 (1998), Thomas Thompson was executed on the basis of Fink's perjured testimony. It is unlikely that Thompson was death-eligible for his part in the crime, if he was guilty at all of any offense. *See generally* Stephen Reinhardt, *The Anatomy of an Execution: Fairness vs. "Process"*, 74 N.Y.U. L. Rev. 313, 322–26 (1999). At Thompson's trial, the prosecutor committed prosecutorial misconduct that

constituted a constitutional violation and required reversal. *See Thompson*, 120 F.3d at 1055. Additionally, Thompson's lawyer provided woefully inadequate representation, which constituted another constitutional violation that required reversal. *See id.* at 1053–54.

Despite a request to reverse Thompson's conviction by seven California prosecutors with extensive death penalty experience, including the author of California's death penalty statute, the Supreme Court refused to consider Fink's perjured testimony or any of the constitutional violations, on the dubious ground that our court abused its discretion in recalling the mandate, on a basis that the Court had never before recognized. *Calderon v. Thompson*, 523 U.S. 538 (1998).

Although Thompson was executed as a result of Fink's perjury (as well as the other unfortunate judicial matters described above), the innocent Mr. Goldstein was fortunate enough to avoid that fate. *See Goldstein v. Harris*, 82 F. App'x 592, 593 (9th Cir. 2003) (affirming the district court's grant of habeas relief). He now seeks civil damages for spending twenty-four years of his life in prison, as a result of the Los Angeles County District Attorney's Office's failure to adopt necessary and reasonable internal administrative policies and procedures. I agree that he is entitled to pursue his claim.

## II.

One of the principal arguments on which the County relies is the California Supreme Court's decision in *Pitts v. County of Kern*, 949 P.2d 920, 923 (Cal. 1998), in which that court held that "the district attorney represents the state, not

the county, when preparing to prosecute and when prosecuting crimes, and when establishing policy and training employees in these areas." I agree with Judge Thomas that we are not bound by *Pitts* and that the policy at issue in *Pitts* differs in kind from the administrative procedure that the District Attorney failed to implement in this case. I write separately, however, to explain why I find the reasoning in *Pitts* to be unpersuasive. In short, the California Supreme Court's reasoning in *Pitts* is imprecise on a question that demands precision.

To begin, the California Supreme Court never clearly states the scope of its holding. On multiple occasions, the state court writes that the setting of policy and training of employees "in these areas" is a state function. *E.g.*, *Pitts*, 949 P.2d at 923; *id.* at 934. I can only presume that "in these areas" refers to the prosecution of crimes. The problem is that virtually every "policy" in a district attorney's office has *some* relationship to the prosecution of crimes. Some policies are directly related to the prosecutorial function—e.g., a policy that prosecutors must instruct their witnesses to tell the truth at all times when testifying. Some procedures are indirectly related, if at all—e.g., a procedure governing the disposal of confidential material in the office. I would call the latter category of procedures "administrative." The real question then is whether the matter *at issue* is prosecutorial or administrative. If prosecutorial, then the district attorney—under the circumstances present in *Pitts*—serves as a state actor. If administrative, then the district attorney—as Judge Thomas's opinion for the court explains—serves as a county actor.

The California Supreme Court in large part avoided this question in *Pitts*. It stated that drawing lines would "require

impossibly precise distinctions." *Pitts*, 949 P.2d at 935. It further declared that "no meaningful analytical distinction can be made between" individual prosecutions and the setting of policy and training of employees. *Id.* Thus, it suggested that the establishing of all policies (including dress codes and the like) and the training of all employees (presumably including secretaries and janitors) is a state function, as well as the prosecution of all cases.

I find the California Supreme Court's imprecise answer unpersuasive, for three reasons. First, the California Supreme Court failed to follow the process set forth in *McMillian*, which is for courts to make an independent determination "whether governmental officials are final policymakers for the local government *in a particular area or on a particular issue*." *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) (emphasis added). In *Pitts*, however, the California Supreme Court made no function-specific determination. Rather, it relied primarily on its conclusion that a district attorney is a state actor when conducting individual prosecutions and asserted that it "logically follow[ed]" that a district attorney was also a state actor when setting policy or training employees. *Pitts*, 949 P.2d at 934–35.[1] In contrast, in our opinion for the court, we conduct a close examination of the relevant constitutional and statutory provisions and conclude that the "Los Angeles County District Attorney represents the county when establishing administrative policies and training related to the general operation of the district attorney's office, including the establishment of an

---

[1] It made only a passing reference to one provision of the California Constitution, Article V, Section 13, which is not specific to the function at issue in *Pitts* or in this case. *See* Maj. Op. at 13–17.

index containing information regarding the use of jailhouse informants." Maj. Op. at 22.

Second, the California Supreme Court's discussion is not internally consistent. Despite asserting that distinguishing policy and training decisions from individual prosecutorial decisions would require "impossibly precise distinctions." *Pitts*, 949 P.2d at 935, the state court stated that its conclusion "might differ were plaintiffs challenging a district attorney's alleged action or inaction related to hiring or firing an employee . . . or some other administrative function." *Pitts*, 949 P.2d at 935. This distinction eludes me. The training of employees is no more related to individual prosecutions than the hiring, firing, or disciplining of those employees. If "no meaningful analytical difference" exists between individual prosecutions and employee training, then it should not exist between individual prosecutions and employee hiring or firing; yet the California Supreme Court suggested that the latter might yield a different conclusion. A better explanation for the California Supreme Court's inconsistency is that it must have recognized that its conclusion would otherwise call into question a vast swath of Section 1983 jurisprudence, in which counties are generally held liable for failure to hire or fire decisions. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997). Unlike the California Supreme Court, we reach a consistent conclusion here: counties should be held liable for their administrative policies and procedures, including the training of their employees *and* the hiring and firing of those employees. *See, e.g.*, *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

Third, the California Supreme Court was simply incorrect when it stated that its conclusion follows as a matter of "logic." The entirety of our opinion contradicts this assertion

of logical inference. As we have demonstrated through a close examination of the various constitutional and statutory provisions, a district attorney may act on behalf of the state when making prosecutorial decisions but act on behalf of the county when setting administrative policy or training employees. *See* Maj. Op. at 11–22. I therefore agree with the highly respected California Supreme Court Justice Stanley Mosk who wrote:

> [T]here is no insurmountable analytical difficulty to concluding that a county cannot be held liable under section 1983 when the district attorney or one of his or her deputies, as an agent of the state, commits prosecutorial misconduct, but can be held liable when the district attorney's hiring, training and supervision program, which the district attorney undertakes as a local policymaker, results in injury to a person's civil rights.

*Pitts*, 949 P.2d at 940 (Mosk, J., dissenting). Indeed, several circuits have come to the same conclusion that we reach here, that district attorneys act as county officers when deciding administrative policy and procedures related to training or supervision, even though they act as state officers when conducting prosecutions. *E.g.*, *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir.1992); *Carter v. City of Philadelphia*, 181 F.3d 339, 352 (3d Cir. 1999); *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir.1997); *Owens v. Fulton County*, 877 F.2d 947, 952 (11th Cir. 1989). Thus, I believe that there can be and is a "meaningful analytical distinction" between prosecutorial decisions and the creation of administrative policy or the training of employees.

I do not suggest that it is always easy to distinguish between policies that are prosecutorial in nature and procedures that are administrative in nature. That point notwithstanding, it is the proper inquiry. Line drawing is frequently a difficult task for jurists. It is, however, one we perform regularly. As Justice Oliver Wendell Holmes wrote almost a century ago:

> Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law. Day and night, youth and age are only types.

*Irwin v. Gavit*, 268 U.S. 161, 168 (1925) (internal citation omitted)*; see also Dominion Hotel v. State of Arizona*, 249 U.S. 265, 269 (1919) (Holmes, J., for the court) ("[T]he constant business of the law is to draw such lines."). Nor is he the only jurist of the Supreme Court to recognize this point.[2]

---

[2] *10 E. 40th St. Bldg. v. Callus*, 325 U.S. 578, 584-85 (1945) (Frankfurter, J., for the court) ("On the terms in which Congress drew the legislation we cannot escape the duty of drawing lines. And when lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases. To speak of drawing lines in adjudication is to express figuratively the task of keeping in mind the considerations relevant to a problem and the duty of coming down on the side of the considerations having controlling weight. Lines are not the worse for being narrow if they are drawn on rational considerations. "); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 847 (1995) (O'Connor, J., concurring) ("Reliance on categorical platitudes is unavailing. Resolution instead depends on the hard task of judging—sifting through the details and determining whether the challenged program offends . . . . Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case."). These are but a handful of the examples in which Justices of the Supreme Court have recognized that line-drawing is inherent in the task of judging.

The *Pitts* court abdicated its judicial function by adopting a rule that avoids a case-by-case inquiry into whether a particular function at issue is prosecutorial or administrative.