Murray WEINER, Plaintiff–Appellant,

v.

SAN DIEGO COUNTY, Defendant–Appellee.

No. 98–55752.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1999.

Filed April 27, 2000

Thomas R. Laube, Sandler, Lasry, Laube, Byer & Valdez, San Diego, California, for the plaintiff-appellant.

Deborah Peterson, Deputy County Counsel, San Diego, California, for the defendant-appellee.

Before: FLETCHER, KOZINSKI and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

## OVERVIEW

In 1994, the Appellant Murray Weiner was tried and convicted of murder in California state court. He was granted a new trial. Before the retrial, the district attorney's office for San Diego County (the "County") allegedly hid blood evidence from Weiner's defense team. In addition, a new blood test undermined the prosecution's original theory of the case. The district attorney's office, nonetheless, continued with the second trial. The trial was before a jury and Weiner was acquitted. After Weiner's acquittal, the district attorney, responding to a query from the press, stated that "[t]his case just proves that cases, unlike fine wine, get worse rather than better, with age."

Weiner then filed the present action in the federal district court against the County. He sought damages under 42 U.S.C. § 1983 for what he alleged was a wrongful prosecution and defamation in violation of his civil rights. He also sought damages for defamation under state law. The district court granted the County's motion for summary judgment. Weiner appeals that judgment.

We have jurisdiction under 28 U.S.C. § 1291. We conclude that the district attorney acted on behalf of the state, not the County, in deciding to prosecute Weiner, and as a result Weiner's § 1983 claim

against the County for his alleged wrongful prosecution fails. With regard to the defamation claims, the alleged defamatory statement—that implied Weiner was acquitted only because the case against him became stale—was the expression of an opinion and as such it will not support a defamation action under California law. Insofar as Weiner attempted to predicate a § 1983 claim on the allegedly defamatory statement, that claim fails because Weiner made no showing of a violation of the Constitution or federal law. *See Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988). Accordingly, we affirm the district court.

## BACKGROUND

In November 1992, Weiner was arrested and charged with the murder of Robert Evans. At trial, the prosecution theorized that Weiner lured Evans into a shed rented by Weiner, killed him, cut his body into pieces, and disposed of the pieces in a field a few miles away.

The prosecution, in its case-in-chief, relied on four of thirty-nine blood spots found in Weiner's shed. The prosecution tested three of the four blood spots by blood grouping, a test which cannot conclusively determine whether the tested blood comes from a particular individual. The test revealed that the three spots had the same 1.1, 1.1 characteristic as Evans's blood. The prosecution tested the fourth blood spot using an RFLP test, which, unlike the blood grouping test, can determine whether blood comes from a particular individual. The RFLP test determined that the fourth blood spot was not from Evans. The prosecution chose not to test the fourth spot for blood grouping to determine whether it had the same 1.1, 1.1 characteristic as the other three blood spots.

Because only two to four percent of the population has the 1.1, 1.1 characteristic, Weiner asserted that if all four blood spots had that characteristic, then all four were probably from the same person, which the RFLP test on the fourth blood spot had determined was not Evans. Although it had not conducted a blood grouping test on the fourth spot, the prosecution argued at trial that the fourth blood spot was not from the same individual as the other three. On February 16, 1994, Weiner was found guilty of murdering Evans.

The trial court, however, granted Weiner a new trial. Weiner asserts that before the second trial the prosecution hired a blood spatter expert who concluded that all four blood spots were from the same person. Further, Weiner contends the prosecution attempted to hide this expert from him and hid the fourth blood spot to prevent Weiner from testing it for the 1.1, 1.1 characteristic. The fourth blood spot was eventually tested and was found to have the same 1.1, 1.1 characteristic as the other three. Because the fourth blood spot came from someone other than Evans, this meant the other three spots probably also came from someone other than Evans and left the prosecutor without blood evidence that Evans was ever in Weiner's shed.

Despite these new findings, the district attorney decided to go forward with the second trial. On August 15, 1996, a jury in the second trial found Weiner not guilty of Evans's murder. After the verdict, a reporter interviewed Weiner's defense counsel, Kathleen Coyne, who expressed her frustration with the district attorney's office because it had ignored the new scientific evidence and had gone ahead with the second trial. The reporter's article went on to state that:

> District Attorney Paul Pfingst vehemently disagreed with Coyne's evaluation of the genetic evidence. He said the case was essentially the same as the first trial and that to dismiss the charges would have been ridiculous, given the first jury's verdict. "This just proves that cases, unlike fine wine, get worse rather than better, with age," Pfingst said.

On February 28, 1997, Weiner filed the present action against the County seeking damages under 42 U.S.C. § 1983 for

wrongful prosecution, and for defamation caused by Pfingst's statement to the press. Weiner also sought damages for defamation under California law. The district court granted summary judgment in favor of the County on all claims, and this appeal followed.

## ANALYSIS

### I. Standard of Review

We review de novo a district court's decision to grant summary judgment. *See Underwager v. Channel 9 Australia,* 69 F.3d 361, 365 (9th Cir.1995).

### II. Section 1983 Liability for Wrongful Prosecution

■ Pursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority "concerning the action alleged to have caused the particular constitutional or statutory violation at issue" and (2) was the policymaker for the local governing body for the purposes of the particular act. *McMillian v. Monroe County Alabama,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (internal quotation marks omitted) (noting that an official can be the policymaker for the state for one type of act and the policymaker for the local government for another type of act). In this case, the parties concede the district attorney is the final decision-maker in determining whether to proceed with a criminal prosecution. The question, therefore, is whether the district attorney acted as a county official or as a state official when he decided to proceed with Weiner's criminal prosecution. The answer to that question is dependent on state law. *See id.* at 786, 117 S.Ct. 1734.

■ In *McMillian,* the Court stated that a state's statement that an individual is a state or county official without analyzing his actual role does not settle the question for Section 1983 purposes. Rather, the official's "actual function ... in a particular area," as defined by state law, must be evaluated to determine whether he acts for the state or the county. *Id.* Accordingly, the Court in *McMillian* reviewed Alabama's constitution, statutes, and case law to determine whether a county sheriff was a state or county official for purposes of § 1983 liability. *See id.* at 787–93, 117 S.Ct. 1734. The Court found it significant that Alabama amended its constitution to list county sheriffs as executive officers who could be impeached by the State Supreme Court upon the order of the governor, which was the same procedure used for other state officials. *See id.* at 788, 117 S.Ct. 1734. Further, the Court stated it was critical that the Alabama Supreme Court had similarly interpreted Alabama's constitution as prohibiting county liability predicated upon the doctrine of *respondeat superior. See id.* at 789, 117 S.Ct. 1734. The Court also focused on the fact that sheriffs in Alabama were given complete authority to enforce state criminal laws in the county and that county commissions could not instruct them in these duties.

On balance, the Court determined that, under Alabama law, a county sheriff was a state official when carrying out his law enforcement duties even though the county paid his salary and provided his equipment, the county's citizens elected him, the Alabama code listed him as a county official, and his jurisdiction was limited to the county's borders. *See id.* at 791–93, 117 S.Ct. 1734.

■ In *Pitts v. County of Kern,* 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920 (1998), the California Supreme Court, following *McMillian,* analyzed California law and held that a district attorney was a state official for purposes of § 1983 liability while acting in his prosecutorial capacity. *See id.* at 928–34. The California Supreme Court is the ultimate interpreter

of California state law. *See Johnson v. Fankell,* 520 U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997). This does not mean, however, that we must blindly accept its balancing of the different provisions of state law in determining liability under § 1983. In *McMillian,* the Court stated that "our inquiry is dependent on an analysis of state law," which does not mean "that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But *our* understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's function under relevant state law." *McMillian,* 520 U.S. at 785, 117 S.Ct. 1734 (emphasis added). We must, therefore, examine California's constitution, statutes, and case law.

Article XI, section 1(b) of California's constitution, entitled "Counties; subdivisions of state; formation, consolidation and boundary change; removal of county seat; powers; officers and employees" states that the state legislature "shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county." District attorneys were added to the list in a 1986 Amendment. *See* Cal. Const. art. XI, § 1(b), historical notes.

Article V, section 13 of California's constitution states that the Attorney General has

direct supervision over every district attorney ... in all matters pertaining to the duties of the respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions.... Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, the Attorney General shall assist any district attorney in the discharge of the duties of that office.

Turning to California's statutory law, there are provisions that weigh both for and against concluding that the district attorney is a state officer. Those provisions indicating that district attorneys are state officers provide that (1) all suits are to be conducted under the name of the state of California, *see* Cal. Gov't Code § 100(b); (2) any county authority to review a district attorney's conduct "shall not be construed to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff and district attorney of a county. The board of supervisors shall not ... obstruct the investigative and prosecutorial function of the district attorney of a county," Cal. Gov't Code § 25303; (3) the "Attorney General has direct supervision over the district attorneys of the several counties of the State and may require of them written reports as to the condition of public business entrusted in their charge" and may assist the district attorney or take full charge of any investigation or prosecution, Cal. Gov't Code § 12550; and (4) the Attorney General can "call into conference the district attorneys ... for the purpose of discussing the duties of their office[ ], with the view of uniform and adequate enforcement of" state laws, Cal. Gov't Code § 12524.

On the other hand, there are California statutory provisions that weigh in favor of concluding that district attorneys are county officers: (1) district attorneys are listed as county officers, *see* Cal. Gov't Code § 24000(a); (2) counties set district attorneys' salaries, *see* Cal. Gov't Code § 25300; (3) district attorneys must be registered to vote in their respective counties, *see* Cal. Gov't Code § 24001; (4) counties supervise the district attorneys' conduct and use of public funds, *see* Cal. Gov't Code § 25303; and (5) district attorneys can be removed

**1030**

from office following the same procedures as applied to district, county, and city officers, i.e., a grand jury submitting a written accusation to the state court, *see* Cal. Gov't Code §§ 3060 & 3073.

Balancing the foregoing constitutional and statutory factors leads us toward the conclusion that under California law a county district attorney acts as a state official when deciding whether to prosecute an individual. The fact that California statutory law lists district attorneys as county officers is not dispositive because, as discussed in *McMillian,* the function of the district attorney, including who can control the district attorney's conduct is the issue. *See McMillian,* 520 U.S. at 792 n. 7, 117 S.Ct. 1734 (giving little weight to fact that the Alabama code listed sheriffs as county officers because the state court had held that the constitution made sheriffs executive officers). Further, in *McMillian,* the Court acknowledged the relevance of the requirements that sheriffs be elected locally and live and vote in the county, but found that these factors were not controlling. *See id.* at 791–92, 117 S.Ct. 1734. Moreover, while California statutory law gives a county some authority to oversee a district attorney's conduct, it expressly excludes conduct related to the investigation and prosecution of crimes, giving that authority instead to the Attorney General. *See* Cal. Gov't Code §§ 26303 & 12550. Therefore, the only significant differences between California law applicable in this case and Alabama law applicable in *McMillian* are that under California law the county sets the district attorney's salary and the district attorney can be removed from office in a fashion similar to other county employees. These differences are not sufficient to produce a result in this case different from the result in *McMillian.*

With regard to a California county's ability to set a district attorney's salary, the California Supreme Court stated in *Pitts,* that this " 'does not translate into control over him....' " *Pitts,* 70 Cal. Rptr.2d 823, 949 P.2d at 934, (quoting *McMillian,* 520 U.S. at 791, 117 S.Ct.

1734). In addition, although California Government Code section 25303 authorizes a county through its Board of Supervisors to "supervise the district attorney's official conduct and in particular his or her use of public funds," that section precludes a county from obstructing "the investigative and prosecutorial function of the district attorney of a county." *Id.* (quoting Cal. Gov't Code § 25303).

With regard to the fact that district attorneys in California can be removed from office in the same fashion as other county officers, this does not mean they are within the control of the county. The removal process authorizes a county grand jury to vote to remove a district attorney from office, but requires the appointment by the state court of a prosecutor to "conduct the proceedings." Cal. Gov't Code § 3073.

In addition to California's constitutional and statutory law, we also consider its case law, giving due respect to decisions by the California Supreme Court as the ultimate interpreter of California state law. *See Johnson,* 520 U.S. at 916, 117 S.Ct. 1800. All relevant California cases, including *Pitts,* have held that district attorneys are state officers for the purpose of investigating and proceeding with criminal prosecutions. In 1894, the California Supreme Court held that the district attorney is "the law officer of the county and the public prosecutor" and that "[w]hile, in the former capacity, he represents the county, and is largely subordinate to and under the control of the board of supervisors, he is not so in the latter. In the prosecution of criminal cases he acts by the authority and in the name of the people of the state." *Modoc County v. Spencer,* 103 Cal. 498, 37 P. 483, 484 (1894); *see also Graham v. Municipal Court,* 123 Cal.App.3d 1018, 177 Cal.Rptr. 172, 174 (1981) ("A county district attorney prosecuting a criminal action within a county, acts as a state officer exercising ultimately powers which may not be abridged by a county board of supervisors.").

■ We conclude that a California district attorney is a state officer when deciding whether to prosecute an individual. A conclusion to the contrary is not compelled by *Gobel v. Maricopa County,* 867 F.2d 1201 (9th Cir.1989). There, we held that a plaintiff might establish that an Arizona district attorney is a county officer when pursuing a criminal prosecution. *Gobel,* however, was decided before the Supreme Court issued its opinion in *McMillian.* In deciding *Gobel,* we relied on several aspects of Arizona law that the Supreme Court in *McMillian* discounted. In particular, in *Gobel* we noted that Arizona's constitution labeled the district attorney as a county officer, the district attorney was elected by county voters, his budget was set by the county board, and his jurisdiction was limited to the county's borders. *See id.* at 1209. In *McMillian,* however, the Court held that the fact that the sheriff was elected by the county's citizens and his authority was limited to the county's borders was insufficient to establish that the sheriff was a state officer. *See McMillian,* 520 U.S. at 791, 117 S.Ct. 1734. Further, the Court rejected the idea that simply labeling an officer as a state or county officer resolves the issue, *see id.* at 786, 117 S.Ct. 1734. The Court also stated that the power to set an officer's salary "does not translate into control over him...." *Id.*

Although a California district attorney is a state officer when deciding whether to prosecute an individual, this is not to say that district attorneys in California are state officers for all purposes. To the contrary, California law suggests that a district attorney is a county officer for some purposes. *See Modoc County,* 37 P. at 484 (acknowledging that in certain instances a district attorney in California is a county officer). In the present case, however, the San Diego County district attorney was acting as a state official in deciding to proceed with Weiner's criminal prosecution. Weiner's § 1983 claim against the County, therefore, fails. The County was not the actor; the state was.

## III. State Law Defamation

■ The First Amendment limits "the types of speech that may give rise to a defamation action under state law." *Gilbrook v. City of Westminster,* 177 F.3d 839, 861 (9th Cir.1999), *cert. denied,* — U.S. —, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999). Opinions, that is "statements that cannot reasonably be interpreted as stating actual facts," are protected by the First Amendment and, as a result, cannot be the basis of a state-law defamation claim. *Id.* (internal quotation marks omitted). In determining whether a statement is a statement of opinion or of fact, we look to the "totality of the circumstances in which [the statement] was made" including (1) the broad context of the statement, (2) the specific context and content of the statement, and (3) "whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Underwager,* 69 F.3d at 366.

In *Underwager,* the plaintiff and defendant were experts on child witness reliability and had testified on opposite sides of a well-publicized case. After the completion of the case, the defendant conducted a workshop during which he expressed his disagreement with the plaintiff's opinions. He also played a tape of other individuals who similarly disagreed with the plaintiff. We held that because the plaintiff and defendant had clearly opposite views on the issue of child witness reliability, "the general context and tenor of [the defendant's] workshop make clear that the comments about [the plaintiff] by him and by those who spoke on the tape were expressions of the speakers' professional points of view (opinions) rather than factual assertions." *Id.* at 366–67.

In the present case, the broad context of District Attorney Pfingst's fine wine statement was in response to Coyne's assertion that the district attorney's office should not have proceeded with Weiner's case. Considering Coyne's role as a defense attorney and Pfingst's as the District Attorney, it is not surprising that each would·

have different views as to why Weiner was acquitted in the second trial. The broad context of the statement, therefore, weighs in favor of concluding that Pfingst's statement was one of opinion, not fact.

 In examining the specific context and content of a statement, we consider "the extent of the figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Id.* at 366. Pfingst's analogy of Weiner's case to fine wine was figurative language used to explain why he believed Weiner was acquitted. Pfingst's audience would likely view his statement as an attempt to explain that it was not because the prosecution did a bad job that the case was lost. Pfingst, after all, was an elected public official who one would assume would try to cast the best possible light on his office. The specific context and content of the statement point toward classifying it as a statement of opinion.

Finally, we consider whether Pfingst's statement was "sufficiently factual to be proved true or false." *See Id.* Weiner asserts that Pfingst's statement implies he was guilty, which he contends is a factual matter. But Pfingst did not say Weiner was guilty. Indeed, the jury had just decided he wasn't. Pfingst said the trial's outcome "just proves that cases, unlike fine wine, get worse rather than better, with age." That was not a statement of fact. It was Pfingst's opinion of why the case was lost. A case can be lost for any number of reasons, among them, poor preparation, poor presentation, unexpected occurrences at trial, a better lawyer or more appealing facts on the other side, or even staleness. In Pfingst's opinion, staleness caused the loss. That face-saving statement was not sufficiently factual to be a statement of fact.

Because all three of the *Underwager* factors weigh in favor of classifying Pfingst's statement as an opinion and not a statement of fact, we agree with the district court that the statement will not support a claim for defamation under California law.

## IV. Section 1983 Claim Predicated on Defamation

 To establish a civil rights claim under 42 U.S.C. § 1983, a plaintiff must assert more than a violation of state tort law-he must show that the defendant deprived him of an interest protected by the Constitution or federal law. *See Paul v. Davis,* 424 U.S. 693, 700–01, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Johnson v. Barker,* 799 F.2d 1396, 1399 (9th Cir.1986). Weiner failed to make this showing. Therefore, even if Pfingst acted as a county official when he made the fine wine statement, and even if in some circumstance the expression of an opinion might support a civil rights claim under § 1983, summary judgment in favor of the County on Weiner's § 1983 claim was proper. Weiner made no showing of a violation "of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer,* 844 F.2d at 632–33; *see Williams v. Gorton,* 529 F.2d 668, 670 (9th Cir.1976) ("[D]efamation itself does not establish a cause of action under [§ 1983]. It is the deprivation of constitutional rights for which the [Civil Rights] Act creates a remedy.")

## CONCLUSION

We hold the district court properly granted summary judgment in favor of the County. Weiner's claim against the County for wrongful prosecution under 42 U.S.C. § 1983 fails because the district attorney, Pfingst, acted in his capacity as a state official, not a county official, when he decided to proceed with Weiner's criminal prosecution. Weiner's California state law defamation claim fails because Pfingst's statement was an opinion. Weiner's § 1983 claim predicated on the alleged defamatory statement fails because Weiner made no showing of a violation of the Constitution or federal law.

AFFIRMED.