**Electronically Filed
Supreme Court
SCCQ-24-0000165
08-APR-2025
08:42 AM
Dkt. 62 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

PUEO KAI McGUIRE,
Plaintiff-Appellant,

vs.

COUNTY OF HAWAIʻI; MITCHELL D. ROTH; KELDEN WALTJEN;
KATE PERAZICH; and SYLVIA WAN,
Defendants-Appellees.

SCCQ-24-0000165

CERTIFIED QUESTION FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI
(CASE NO. 23-00296 JAO-KJM)

APRIL 8, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, AND DEVENS, JJ.;
WITH GINOZA, J., CONCURRING SEPARATELY

OPINION OF THE COURT BY EDDINS, J.

The United States District Court for the District of

Hawaiʻi certified a question to this court:

> Under Hawai'i law, does a county Prosecuting Attorney and/or Deputy Prosecuting Attorney act on behalf of the county or the state when he or she is preparing to prosecute and/or prosecuting criminal violations of state law?

Our answer: "the county."

We accepted the question per Hawai'i Rules of Appellate Procedure Rule 13. As with recent certified questions from the Ninth Circuit Court of Appeals and Hawai'i's federal district court, we appreciate the federal courts' respect for the sovereignty of Hawai'i by inviting our court to first answer an unsettled area of state law.

The federal case involves a 42 U.S.C. § 1983 action for, among other claims, malicious prosecution. Pueo McGuire sued the County of Hawai'i. He also sued the county prosecutor, and three deputy prosecutors in their official and individual capacities. They violated his constitutional rights, McGuire alleged.

Our answer to the district court's question depends on who has final policymaking authority to prosecute crimes in a county. See McMillian v. Monroe Cnty., 520 U.S. 781, 785 (1997).

The county does. We hold that, in Hawai'i, county prosecuting attorneys and their deputies are county officials when they are preparing for and prosecuting state law offenses.

## I.    The "actual function" of government officials is a state law matter

First, some background about the role of state law in this federal civil rights action, and where sovereign immunity comes into play.

We start with 42 U.S.C. § 1983's text.  It says:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

This statute has no qualifiers and its remedy is categorical.  Textually, "[e]very person" has no exceptions.  42 U.S.C. § 1983.  Section 1983 exempts one "person" though - "judicial officer[s]."  Id.  All others who act under "color of any" law and deprive another of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Id.

States are invulnerable to suit unless the state waives its sovereign immunity, or Congress overrides a state's immunity under the Fourteenth Amendment.  U.S. Const. amend. XI; Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  When

3

Congress passed § 1983, it "[did not intend] to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance . . . [.]"  Will, 491 U.S. at 66.  Therefore, under 42 U.S.C. § 1983, states and state officials (in their official capacities) are not "persons."  Id. at 71.

In contrast, municipalities – like the County of Hawai'i - are persons.  While the Eleventh Amendment protects states from suit, Congress intended § 1983 "persons" to include muncipalities.  Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694 (1978).  "[T]here is certainly no constitutional impediment to municipal liability."  Id. at 690 n.54.  Local governments "are not considered part of the State for Eleventh Amendment purposes."  Id.  Thus, a municipality and its officials are "persons," and not immune to § 1983 suits.

McMillian imparts a twofold test to determine whether an official's conduct may result in municipal liability.  520 U.S. at 785.  To hold a local government liable for an official's conduct, a plaintiff must first establish that the official had final policymaking authority for the government "concerning the action alleged to have caused the particular constitutional or statutory violation at issue."  Id.  Second, a plaintiff must establish that the official functioned as the policymaker of the local government for the particular area or issue in question.  Id. at 786.

4

Federalism principles establish that the test is "dependent on an analysis of state law." Id. at 786, 794 (rejecting plaintiff's argument – that a state-by-state and county-by-county inquiry creates a lack of uniformity for nationwide law enforcement policy – because, among other reasons, "a crucial axiom of our government[] [allows] the States [to] have wide authority to set up their state and local governments as they wish"); Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.").

Here, there's no dispute about final policymaker authority. Both sides agree that the county's prosecuting attorney makes the final call to prosecute someone. But both sides say that Hawai'i law resolves the second part of McMillian's test their way. The federal district court considered the matter unsettled.

Thus, the certified question. Do county prosecutors act as county or state officials when they prosecute?

Federal courts look at an official's "actual function" to determine whether they act on behalf of the state or the county. McMillian, 520 U.S. at 791. The actual function test for section 1983 actions involves state or county "control" over the

5

official.  See id.  A key Ninth Circuit case that applies this test, the district court observes, is Weiner v. San Diego Cnty., 210 F.3d 1025, 1028 (9th Cir. 2000).

Thus, we need to decide who controls county prosecutors.

Next, we canvass our state constitutional and statutory structure, county charters, and case law.  This review supports our view that the state does not "control" county prosecutors for purposes of 42 U.S.C. § 1983 actions.

## II.   Federal law sets forth the general "control" test for municipal liability, but does not narrowly constrain our Hawai'i law analysis

In § 1983's context, "control" is measured by the government entity's degree of control over the government official.  Because this examination involves whether the entity can - and does - *actually* influence official conduct, the mere existence of the *ability* to control is not enough.

McMillian held that sheriffs were state officials.  520 U.S. at 793.  This decision hinged on the Alabama Governor and attorney general's "direct control" over county sheriffs.  Id. at 791.  Per Alabama law, the governor and state attorney general could "direct the sheriff to investigate 'any alleged violation of law in their counties.'"  Id.  The sheriff was then required to "promptly" write a report to the state official in charge of the investigation.  Id.  The report had to include

6

findings and a witness list, and "summarize[e] what the witnesses can prove." Id.

McMillian also suggested what is *not* sufficient to establish "control." Control of the purse strings does not necessarily mean control over a county's prosecuting attorney. Payment of a sheriff's salary "does not translate into control over him." Id. The county's ability to deny funds to sheriffs for supplies, lodging and expense reimbursement meant, at most, "attenuated and indirect" influence over the sheriffs' operations. Id. at 791-92. Thus, McMillian reasoned that together, the county's payment of the sheriffs' salary and county treasury funding of the sheriff's department equipment, was insufficient "control" to make sheriffs county officials. Id.

Similarly, the Ninth Circuit held that "a [California] county district attorney acts as a state official when deciding whether to prosecute an individual." Weiner, 210 F.3d at 1030. California's constitution grants the state's attorney general (AG) significant "control." See id. at 1029. The California AG has "direct supervision over every district attorney . . . in all matters pertaining to the duties of their respective offices[.]" Cal. Const. art. V, § 13.

The court also considered four California statutory provisions persuasive.  <u>Weiner</u>, 210 F.3d at 1029.  First, prosecutions are conducted in the name of the state.  <u>Id.</u> Second, county authorities may not affect the independent investigative and prosecutorial functions of the sheriff and district attorney.  <u>Id.</u>  Third, the attorney general directly supervises county district attorneys, may require them to submit reports, and may assist the district attorney or take full charge of any investigation or prosecution.  <u>Id.</u>  And fourth, the attorney general can "'call into conference the district attorneys . . . for the purpose of discussing the duties of their office[], with the view of uniform and adequate enforcement of' state laws."  <u>Id.</u>

There was no county control, <u>Weiner</u> held.  The district attorneys' classification as county officers, salary-setting by the county, the county's supervision of district attorneys and their public fund usage, district attorney residence requirements, and county removal procedures for district attorneys were not enough to establish county "control."  <u>Id.</u> at 1029-30.  Plus, California statutes barred county authorities from reviewing a district attorney's investigative and prosecutorial functions, and reserved direct supervision over district attorneys to the attorney general.  <u>Id.</u> at 1030 (citing

8

Cal. Gov't Code § 26303 and § 12550). Thus, county district attorneys acted on behalf of the state. Id.

Together, McMillian and Weiner show that § 1983's "state or county" inquiry turns on direct control, not implied control. See McMillian, 520 U.S. at 791; Weiner, 210 F.3d at 1030. But these federal cases do not give us a clean analogue to assess "control" under our state laws.

Hawai'i's constitutional and statutory framework, and case law do not neatly compare to California's constitutional setup. As described in Weiner, California's constitution grants the attorney general "direct supervision over every district attorney . . . in all matters pertaining to the duties of [their] respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions[.]" See 210 F.3d at 1029; Cal. Const. art. V, § 13.

The Hawai'i Constitution identifies the attorney general as "chief legal officer." Haw. Const. art. V, § 6. But it does not confer anywhere near the degree of control over county prosecutors present in the California Constitution.

California and Hawai'i law are misaligned. Like its constitution, California law provides that the "Attorney General

9

has direct supervision over the district attorneys of the several counties of the state and may require of them written reports as to the condition of public business entrusted in their charge." Cal. Gov't Code § 12550. Its attorney general "may [also] assist the district attorney or take full charge of any investigation or prosecution." Weiner, 210 F.3d at 1029 (citing Cal. Gov't Code § 12550).

In contrast, missing from the Hawai'i Constitution and Hawai'i statutes are provisions that grant the attorney general "direct supervision" over county prosecutors or the ability to take "full charge of *any* investigation or prosecution." See Cal. Const. art. V, § 13; Cal. Gov't Code § 12550 (emphasis added).

Our state law governs. Federal law plays a limited role here. To repeat, an official's "actual function" and the level of "control" rendering persons state or county officials in Hawai'i is a state law matter. See City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (identification of policymaking officials is not a question of federal law because "States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms"). Because this is a state law

consideration, we are not limited by factors outlined in federal cases to determine control under state law.

We now look to the history of state and county prosecutorial power in Hawai'i, the Hawai'i Constitution, state statutes, and county charters.

## III. The history of prosecutorial authority in Hawai'i

The Attorney General's amicus brief recounts the history of prosecutorial authority in Hawai'i.

In 1844, King Kamehameha III created the attorney general position. First Act Kamehameha III, An Act to Organize the Executive Ministry of the Hawaiian Islands, § 2 (Oct. 29, 1845). The attorney general provided advice and counsel to the King and his ministers, issued legal opinions to the Legislative Council, appeared for the government in all legal proceedings, and investigated and prosecuted "all crimes." Second Act Kamehameha III, An Act to Organize the Executive Departments of the Hawaiian Islands, part 5, §§ 4-5; id. at part 5, tit. 1, § 1; id. at part 5, tit. 2, ch. 3 (Apr. 27, 1846). In 1846, King Kamehameha III empowered the attorney general to appoint district attorneys to serve as his agents in prosecuting minor offenses at "each of the ports of entry and departure." Id. at part 5, tit. 2, ch. 3, § 21. District attorneys were removable at the pleasure of the attorney general. Id. But in 1847, the

11

office of the attorney general was suspended, and the AG's powers were divided.  Joint Resolution of May 4, 1847, § 2.  The new law allowed superior court judges to appoint and remove district attorneys for the judicial districts.  Id.  At the time, Hawai'i was divided into four judicial districts, the first encompassing "[t]he Island of Oahu," the second encompassing "[t]he islands of Maui, Molokai and Lanai," the third encompassing "[t]he Island of Hawaii," and the fourth encompassing "[t]he islands of Kauai and Niihau[.]"  Third Act Kamehameha III, An Act to Organize the Judiciary Department of the Hawaiian Islands, ch. 3, art. 1, § 1 (Sept. 7, 1847).  That system remained for nearly 60 years.

In 1905, Act 39 divided the Territory of Hawai'i into counties.  1905 Haw. Sess. Laws Act 39.  Each elected county attorney served as the "public prosecutor for the County" and prosecuted Territory laws and County Board of Supervisors ordinances "on behalf of the people."  1905 Haw. Sess. Laws Act 39, at §§ 12, 90 at 50-51, 75.  Each county attorney was "a deputy of the Attorney General of the Territory," but this designation did not "prevent the Attorney General or any of [their] deputies from appearing and representing the Territory in any case in which the rights or interests of the Territory are involved."  Id. at §§ 95, 96 at 77.

12

A 1931 case changed things.  The Massie trial, the murder of Joseph Kahahawai (one of five men falsely accused of raping Thalia Massie), and the trial of his killers, Massie's Navy officer husband and "two of [his] navy protégées," received national attention.  See Stewart Chang, Bridging Divides in Divisive Times: Revisiting the Massie-Fortescue Affair, 42 U. Haw. L. Rev. 4, 5-6, 29 (2020); James Podgers, When Change Arrived, A.B.A. J., Oct. 2006, at 64.  Mainland press expressed outrage at "the failure of Hawaii's justice system to protect white women from attacks by natives."  Podgers, supra, at 64.

Fearing mainland interference in local affairs (even a declaration of martial law) the Territory quickly established a public prosecutor for Honolulu who was subject to removal by the attorney general.  1932 1st Spec. Sess. Haw. Sess. Laws Act 13, § 1 at 18; Alexa Fujise, A Hundred Years in the Pursuit of Justice, Haw. B.J., Oct. 1999, at 71; see Chang, supra, at 5-6, 29 ("Indeed, the involvement of the mainland in pressuring territorial Governor Judd to commute the sentences was troubling for the local population.  Even though for Judd the commutation of the sentences was less racially motivated than politically expedient, the pressures from the mainland were heavily steeped in racist hysteria, which was then being imposed on the islands."); Mike Farris, A Death in the Islands: The Unwritten Law and the Last Trial of Clarence Darrow, 297 (2016) ("Even

13

President Herbert Hoover got into the act, under pressure from his old friend Walter Dillingham, meeting with his cabinet to discuss whether to declare martial law in Hawaii unless Judd pardoned the defendants [who murdered Joseph Kahahawai].").

The Territorial Legislature passed a "bill" to provide for a public prosecutor in Honolulu. 1932 1st Spec. Sess. Haw. Sess. Laws Act 13 (approved February 9, 1932). The Act required the public prosecutor to "[a]ttend all courts in the city and county and *under the control and direction of the attorney general* conduct on behalf of the people all prosecutions therein for [Territory law and county ordinance] offenses." Id. at § 1 at 19 (emphasis added).

The Massie affair - the trial of the "Ala Moana Boys," the murder of an innocent young Native Hawaiian man, and the commutation of his killers' sentences to one hour – is well-chronicled. See, e.g., David E. Stannard, Honor Killing: Race, Rape, and Clarence Darrow's Spectacular Last Case (2006); John P. Rosa, Local Story: The Massie-Kahahawai Case and the Culture of History (2014); *American Experience: The Massie Affair* (PBS television broadcast Apr. 18, 2005).

Honolulu now had a prosecutor who was appointed by the mayor, and worked "under the control and direction of the attorney general." 1932 1st Spec. Sess. Haw. Sess. Laws Act 13, § 1 at 19. The 1932 law authorized the attorney general to

14

remove the Honolulu Prosecuting Attorney.  Id. at § 1 at 18.  An AG exercised that power in 1947.  See Fujise, supra, at 71. Acting Attorney General Rhoda Lewis, with the approval of Governor Ingram Stainback, removed Honolulu Prosecuting Attorney Joseph Esposito for "demonstrated unfitness."  See Fujise, supra; Harry Stroup, Stainback Fires Esposito - Governor, Lewis Take Joint Action on C-C Prosecutor, The Honolulu Advertiser, Oct. 11, 1947, at 1.

In 1957, the Territorial Legislature revised the law.  The public prosecutor, their deputies, and county attorneys were no longer deputies of the state attorney general.  Amemiya v. Sapienza, 63 Haw. 424, 426, 629 P.2d 1126, 1128-29 (1981) (citing 1957 Haw. Sess. Laws. Act 233).  And no longer could the AG remove the public prosecutor.  Id.  Committee reports do not describe why the legislature made these changes.  Id. (citing H. Stand. Comm. Rep. No. 518, in 1957 House Journal, at 786).

Today, this division of prosecutorial power – where county prosecutors are not deputies of the attorney general - remains.

**IV.  The state prosecutorial framework today**

Today's prosecutorial framework delegates power to both the state and county.

The Hawai'i Constitution designates the attorney general as the state's "chief legal officer."  Haw. Const. art. V, § 6.

15

Hawai'i Revised Statutes (HRS) § 26-7 (2009) identifies the AG's duties.

Hawai'i's chief legal officer provides legal services to the executive and legislative branches.  HRS § 26-7.  The AG also represents the state "in all civil actions in which the State is a party" and prosecutes cases that involve "agreements, uniform laws, or other matters which are enforceable in the courts of the State."  Id.  Further, the AG approves the "legality and form [of] all documents relating to the acquisition of any land or interest in lands by the State."  Id.  There's more.  The attorney general "shall be charged with such other duties and have such authority as heretofore provided by common law or statute."  Id.

HRS § 26-7 describes the attorney general's prosecutorial powers.  The AG shall "prosecute cases involving violations of state laws."  Id.  Prosecuting crimes though is just one part of the attorney general's responsibilities.  And HRS § 26-7's "unless otherwise provided by law" language restrains that prosecutorial authority.

The AG is tasked generally with state law prosecutions.  The AG "shall appear for the State personally or by deputy, in all the courts of record, in all cases criminal or civil in which the State may be a party."  HRS § 28-1 (2009).

Additionally, "[t]he attorney general shall be vigilant and active in detecting offenders against the laws of the State, and shall prosecute the same with diligence."  HRS § 28-2 (2009).

The Hawai'i Constitution also advances home rule, local government with minimal state interference.  Our state constitution affords each county the "power to frame and adopt a charter for its own self-government."  Haw. Const. art. VIII, § 2.  Concerning a county's authority to prosecute crime, state law grants each county the "power to provide by charter for the prosecution of all offenses and to prosecute for [state law offenses] under the authority of the attorney general of the State."  HRS § 46-1.5(17) (2012 & Supp. 2023).  Each county's charter provides for the prosecution of state law offenses within its county jurisdiction, and each county has its own prosecuting attorney whose election or appointment, qualifications, powers, and duties are provided for by charter. Hawai'i County Charter, art. IX; Revised Charter of the City and County of Honolulu, art. VIII; Charter of the County of Kaua'i, art. IXA; Charter of the County of Maui, art. 8, ch. 3.

The Hawai'i County Charter directs the county prosecuting attorney to prosecute state law and county ordinance offenses on behalf of "the people."  HCC § 9-3(a)(1).  The county prosecuting attorney is mandated to "[a]ttend all courts in the

17

county" and prosecutes state law offenses "under the authority of the attorney general of the State."  HCC § 9-3(a)(1)-(2).

County prosecutors serve their counties.  Other than Maui, Hawai'i's people elect their local prosecutor.  See Maui County Charter § 8-3.2.  A candidate for Hawai'i County prosecutor must be "a duly qualified elector of the county for at least one year immediately preceding the election."  HCC § 9-2.  The Hawai'i County Charter places the power to appoint (by election) and impeach or recall (by signed petition) the prosecuting attorney with the county's voters, not statewide voters.  See HCC §§ 9-1, 9-6.  And though a state circuit court holds an impeachment trial, this procedure applies to the mayor too, not exactly a state official.  See HCC § 12-2.1.  As for compensation, the Hawai'i prosecuting attorney's salary is set by a "salary commission . . . appointed by the mayor."  See HCC § 13-28; cf. McMillian, 520 U.S. at 791 (holding that a county does not "control" an officer it pays if it does not have the authority to change his salary).

Against this backdrop, Amemiya explains how prosecutorial power is distributed between the state and the counties.

## V.    Amemiya's framework confers primary prosecutorial power to county prosecutors

This court has a case that squarely addresses the division of prosecutorial power between the state and its counties.

18

Amemiya, 63 Haw. at 425, 629 P.2d at 1128.  Per Amemiya, the degree of control exercised by Hawai'i's Attorney General over county prosecutors is slight.

The county argues that the Hawai'i Constitution and case law allow the attorney general to control county prosecuting attorneys.  It also maintains that though the Hawai'i County Charter delegates duties to its county prosecutor, this authority is inferior to the authority of the state attorney general.  The county believes that Amemiya reconciled provisions of state law that attribute power to both state and county offices.  Per Amemiya, the state controls county prosecutions, insists the county.

Not so.  Amemiya's message is unmistakable.  True, it acknowledged the attorney general as the state's chief law enforcement officer.  Id. at 427, 629 P.2d at 1129.  But it also understood that the Honolulu County prosecutor "has been delegated the *primary* authority and responsibility for initiating and conducting criminal prosecutions within [their] county jurisdiction."  See id. at 427, 629 P.2d at 1129 (emphasis added).

Given the AG's "ultimate responsibility" to enforce penal laws, Amemiya carefully balanced that authority with the prosecutorial power granted to a county.  Id.  This court

19

concluded that the state attorney general retains "residual authority to act." Id. That power allows the AG to "supersede" the public prosecutor and intercede in "compelling circumstances." Id. at 427-28, 629 P.2d at 1129.

The AG's residual authority may only be invoked where it is "clearly apparent that compelling public interests require the attorney general's intervention in the particular matter." Id. at 428, 629 P.2d at 1129. For instance, "where the public prosecutor has refused to act and such refusal amounts to a serious dereliction of duty on [their] part, or where, in the unusual case, it would be highly improper for the public prosecutor and [their] deputies to act." Id.

The attorney general's limited ability to supersede a county prosecuting attorney's authority in compelling circumstances does not equate to "control." Amemiya dispatches a contrary view:

> The phrase "under the authority of the attorney general" is a recognition of [their] status as the State's chief law enforcement officer and cannot sensibly be construed as a reservation of power to usurp, at [their] sole discretion, the functions of the public prosecutor. Any other view would lead to potentially absurd and chaotic results.

Id. at 427, 629 P.2d at 1129 (emphasis added).

The Attorney General takes no position in her amicus brief about the certified question's answer. But she urges this court to retain the "workable, flexible, and effective" balance that

20

Amemiya struck between the attorney general's office and county prosecutors.

We do. Amemiya's division of prosecutorial power endures. We hold that county prosecutors act on behalf of the county – not the state - when preparing to prosecute or prosecuting offenses.

The county maintains that "the [attorney general's] residual authority to act means the attorney general as the State's chief law enforcement officer may supersede the prosecuting attorney's powers in certain compelling circumstances." But the narrow circumstances to support the Hawai'i attorney general's authority to sideline a county prosecutor, show the lack of "control" the state has over county prosecutors. See McMillian, 520 U.S. at 786 (holding that the "actual function" inquiry requires definition of the official's functions under relevant state law).

The Attorney General relates that historically her office has almost never tried to supersede county prosecuting attorneys. Amemiya is the only time this court has addressed the issue of the attorney general displacing a county prosecutor's control over prosecutions within the county.

The Department of the Attorney General neither prosecutes nor oversees most criminal prosecutions in Hawai'i. The county

prosecutors do.  The Attorney General reports that an "overwhelming majority of these cases were brought by county prosecutors with no direct oversight or participation by the Department of the Attorney General."

What about the title of a criminal case, the county grumbles.  In Hawaiʻi, criminal prosecutions are captioned State v. Defendant.  But this convention doesn't recast a county prosecutor as a state prosecutor.  Control matters.

The county's argument that the state may control the county prosecutor in certain circumstances does not approach "direct control."  See McMillian, 520 U.S. at 791; Weiner, 210 F.3d at 1030.  The state attorney general only steps in under compelling circumstances, like when there's a "serious dereliction of duty."  Amemiya, 63 Haw. at 428, 629 P.2d at 1129.  Refusal to act may constitute a dereliction of duty.  Id.  While AG "usurpation" is possible, there is no "direct control" over day-to-day prosecutions such that county prosecuting attorneys are considered state officials.  Cf. McMillian, 520 U.S. at 791; Weiner, 210 F.3d at 1030.

Next, this court has previously held in the state tort law vicarious liability context that county prosecutors are county officials.  See Orso v. City & Cnty. of Honolulu, 56 Haw. 241, 248, 534 P.2d 489, 493 (1975) (holding under the doctrine of respondeat superior that a "prosecuting attorney is an officer

22

of the executive branch of the [county]").  We understand - state court vicarious liability claims are different than federal civil rights claims, and vicarious liability theories are inapplicable to § 1983 actions.  <u>See</u> <u>Monell</u>, 436 U.S. at 691 (holding that a local government may not be sued under a theory of vicarious liability for injuries inflicted solely by its employees or agents).  But our state law analysis does not alter simply because the present case involves a federal civil rights claim.  A plaintiff pleading a § 1983 action does not transform county prosecutors into officers of the state.  The distinction between state tort law and § 1983 governs the standard by which liability may ultimately attach to a local government.  Yet it does not change the constitutional and statutory role of county prosecutors under Hawai'i law.

Therefore, <u>Orso</u>'s conclusion that county prosecutors are county officers, further supports our holding that county prosecutors act on behalf of the county when preparing to prosecute and/or prosecuting state law offenses.

**VI.  We decline to extend state sovereign immunity to county prosecutors**

We decline to extend state sovereign immunity to county prosecutors.  County prosecutors are not state officials when initiating or conducting prosecutions for state law crimes.  Rather, county prosecutors are suable section 1983 persons.  The

state's Eleventh Amendment sovereign immunity does not extend to the county and its prosecutors. To hold otherwise would unduly narrow federal civil rights actions in Hawai'i.

42 U.S.C. § 1983 involves a federal claim. But state law can determine its scope. McMillian, 520 U.S. at 786, 794. As the district court explained in its certification order, state law decides whether an official's "actual function" renders them a state or county official. Id. at 791. This case's "state or county" outcome directly impacts the extent of section 1983 claims brought in our state's federal court. See id.

Do county prosecutors in their official capacities enjoy sovereign immunity's cover? Our answer to the certified question answers that question in real time.

The district court requests our interpretation of state law. Because our analysis directly impacts the reach of federal civil rights actions in Hawai'i, we decline to artificially untether our holding from its effects.

This court, as the concurrence observes, applies federal law when plaintiffs raise section 1983 claims in state court. Gordon v. Maesaka-Hirata, 143 Hawai'i 335, 354, 431 P.3d 708, 727 (2018) (circuit court failed to apply the federal "clearly established" test when it ruled that a prison official had qualified immunity because she did not know she was violating an

24

inmate's constitutional rights); Brown v. Thompson, 91 Hawai'i 1, 14-16, 979 P.2d 586, 599-601 (1999) (due process rights violated by state officials in their individual capacities were not "clearly established," so the officials enjoyed qualified immunity). Those cases applied federally-established section 1983 qualified immunity because "[f]ederal law dictates the characterization of claims brought under § 1983." Id. at 14, 979 P.2d at 599.

A discussion of qualified immunity's development and impact does not undercut our state courts' "recognition and application" of federal law in section 1983 claims.

Here, our state law holding intersects with the federal law application. Thus, we examine not only our state and county frameworks, but also the historic context and Reconstruction Era injustices that impelled Congress to create this civil rights action. Section 1983's origin and purpose directly relate to the question of scope that we necessarily decide.

42 U.S.C. § 1983's purpose guides us.

"After the Civil War, white supremacists unleashed waves of terrorism across the South." Green v. Thomas, 734 F. Supp. 3d 532, 543 (S.D. Miss. 2024) (citing Eric Foner, Reconstruction: America's Unfinished Revolution 1863-1877 (1988); Nicholas Lemann, Redemption: The Last Battle of the Civil War (2006)). "[M]en were murdered, houses were burned, women were outraged,

men were scouraged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent." Monroe v. Pape, 365 U.S. 167, 175 (1961) (citing Cong. Globe, 42d Cong., 1st Sess., 428 (1871)).

Local and state government officials failed to protect new citizens and those who supported them from lawlessness and violence. The nation needed "to provide a remedy for the wrongs being perpetrated' on Black folk." Green, 734 F. Supp. 3d at 543 (citing Pierson v. Ray, 386 U.S. 547, 559 (1967) (J. Douglas, dissenting)).

Congress acted. "In early 1871, a Senate Select Committee produced and distributed a Report that ran hundreds of pages and recounted pervasive state-sanctioned lawlessness and violence against the freedmen and their White Republican allies." Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166, 176 (2023) (quoting Monroe, 365 U.S. at 174 (citing S. Rep. No. 1, 42d Cong., 1st. Sess. (1871)). As one Congressman put it, "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices . . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous

things an injured party can do is to appeal to justice."
Talevski, 599 U.S. at 176 n.4 (quoting Mitchum v. Foster, 407
U.S. 225, 241 (1972) (citing Cong. Globe, 42d Cong., 1st Sess.,
App. 78 (1871)).

During Reconstruction the playbook included malicious
prosecutions. Southern states "aggressively us[ed] civil and
criminal prosecutions to obstruct federal enforcement of civil
rights." Margaret Z. Johns, Unsupportable and Unjustified: A
Critique of Absolute Prosecutorial Immunity, 80 Fordham L. Rev.
509, 522-23 (2011). Prosecutors targeted formerly enslaved
human beings, Republicans, and Union supporters. Id. at 523.
Also, "anti-Reconstruction campaigns included state-sanctioned
criminal prosecutions of Union officers and federal officials
for attempting to enforce federal laws." Id.

To remedy state led and endorsed lawlessness, Congress
passed the Ku Klux Klan Act of 1871. 42 U.S.C. § 1983
"contemplated direct federal intervention in what had been
considered to be state affairs" and allowed federal courts to
"enforce newly created federal constitutional rights against
state officials through civil remedies and criminal sanctions."
Green, 734 F. Supp. 3d at 544 (quoting Katherine A. Macfarlane,
Accelerated Civil Rights Settlements in the Shadow of Section
1983, 2018 Utah L. Rev. 639, 660 (2018). "The very purpose of
§ 1983 was to interpose the federal courts between the States

and the people, as guardians of the people's federal rights — to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" Mitchum, 407 U.S. at 242 (citing Ex Parte Commonwealth of Virginia, 100 U.S. 339, 346 (1879) (holding that § 1983 "expressly authorizes" federal injunctions of state proceedings because of its historic legislative purpose to guard every person's federal constitutional rights).

Section 1983's goals guide us. Its historic and legal roots animate our state law considerations.

The answer to the district court's certified question affects the scope of federal civil rights claims in our state. We believe Hawai'i law advances section 1983's promised path to redress for constitutional rights deprivations at the local level. The county and county officials are not sheltered from consequences – like the state - when civil rights are violated.

Amemiya considered the power divide between state and county prosecuting entities. In Amemiya, the attorney general asked to supersede the county prosecutor, but only in compelling circumstances. Amemiya, 63 Haw. at 427-28, 629 P.2d at 1129 ("With admirable restraint, [the AG] asks only that it be determined that in certain compelling circumstances [the AG] is empowered to intercede."). So Hawai'i's counties – with the

attorney general's blessing – kept the core prosecutorial powers: "primary authority and responsibility for initiating and conducting criminal prosecutions."  See id.

A county drives prosecutions within its boundaries.  Only "compelling circumstances" justify state intrusion.

Because we hold that county prosecuting attorneys and their deputies are county officials under state law, we fulfill section 1983's intent - to ensure federal protection of constitutional rights at the local government level.

Our decision does not create new county liability, as the county believes.  Rather, it rejects *new* protections for the county.  Congress expressly intended that local municipalities are "persons" under § 1983.  See Monell, 436 U.S. at 700-01.  Still, a local municipality is only liable under § 1983 if an official's actions furthered the government's unconstitutional policy or custom.  Id. at 690.  A county isn't liable for free-lanced, non-policy acts by its employees or agents.  Id. at 694.  Thus, while the county is exposed to section 1983 litigation because it lacks state sovereign immunity, its liability is more constrained than the county lets on.  See id.

The county also worries that it faces increased section 1983 litigation if we rule that county prosecutors are county officials; it says, "sovereign immunity and absolute and qualified immunities defenses would not be available."  The

county says that we should answer the certified question "the state," because without these immunities, it would defend more suits. So we examine absolute and qualified immunities within the section 1983 context.

The concurrence misreads our discussion of absolute and qualified immunity. This court does not "reformulate" the certified question or coach the federal court's independent call on the defendants' individual capacity defenses. Nor do we place a "thumb on the scale" for future federal qualified immunity cases in our federal district court. (Federal courts rely on federal precedent to decide federal civil rights claims.)

The county raised concerns that our answer to the certified question impacts available immunities for county prosecutors. Because the county conflates individual and official capacity immunities, we clarify how these immunities fit into the section 1983 framework. We also highlight the strength of these federal protections.

Once more, our decision directly impacts 42 U.S.C. § 1983 actions against Hawai'i's county prosecutors. As asked, we answer a state law question. In doing so, we must consider the answer's natural effects.

Today counties and county prosecutors enjoy generous protection in federal court. The county itself faces only

limited potential liability under § 1983. Its officials must act based on policy or customs that violate constitutional rights. Monell, 436 U.S. at 690. Also, judicially-fashioned immunity still shields county prosecutors and their deputies in their individual capacities. Imbler v. Pachtman, 424 U.S. 409, 420 (1976) (prosecutors enjoy "absolute immunity from § 1983 suits for damages when [they] act[] within the scope of [their] prosecutorial duties"); Van de Kamp v. Goldstein, 555 U.S. 335, 343 (2009) (absolute immunity from § 1983 liability attaches "when a prosecutor prepares to initiate a judicial proceeding" or "appears in court to present evidence in support of a search warrant application").

There's more, immunity-wise, to aid prosecutors. Where absolute immunity does not apply, prosecutors still have qualified immunity.

Nearly 100 years after its words became law, the Supreme Court slid qualified immunity into § 1983 as a "good faith and probable cause" defense. See Pierson, 386 U.S. at 554-57 (asserting that the "good faith and probable cause" defense existed under the common law when Congress enacted § 1983, and supposing that Congress would have expressly barred the doctrine had it wanted to).

Some say that there is no legal basis for qualified immunity. See, e.g., William Baude, Is Qualified Immunity

Unlawful?, 106 Calif. L. Rev. 45, 55-61 (2018). "There was no well-established, good-faith defense in suits about constitutional violations when Section 1983 was enacted, nor in Section 1983 suits early after its enactment." Before the Civil War, "suits for damages against government officials were not litigated directly as constitutional torts." Id. at 51. Instead, Constitutional claims were litigated as common-law torts, where constitutionality only arose in response to a government official's defense. See id. at 51-52. Section 1983 thus created a direct cause of action (and a new framework) for constitutional violations, raising "questions about how the new constitutional claims related to the old common-law claims, and whether the common law had any role to play in the new constitutional suits." Id. at 52.

Soon the Supreme Court strayed from 1871's putative common law. The Court grafted new features to section 1983 "untethered from any statutory or historical baseline." S. Rafe Foreman, Qualified Immunity: A Legal Fiction That Has Outlived Utility, 48 Ohio N.U. L. Rev. 503, 519 (2022). The good faith test evolved to a clearly-established-law test. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Court displaced the common law's subjective test with an objective one. Good faith was out. And because bad faith no longer mattered, it was in. Mullenix v. Luna, 577 U.S. 7, 26 (2015) (Sotomayor, J.,

dissenting) ("[A]n officer's actual intentions are irrelevant to the Fourth Amendment's 'objectively reasonable' inquiry.").

Qualified immunity whitewashes civil rights deprivations by excusing bad-acting officials from liability so long as their conduct does not offend a clearly established right. "A cynic might say that with qualified immunity, government agents are at liberty to violate your constitutional rights *as long as they do so in a novel way*." Green, 734 F. Supp. 3d at 540; Malley v. Briggs, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); Kisela v. Hughes, 584 U.S. 100, 121 (2018) (Sotomayor, J., dissenting) ("[The Court's] one-sided approach to qualified immunity . . . tells the public that palpably unreasonable conduct will go unpunished.").

The Court's policy swing (with little thought to the policies that inspired § 1983) means that "[i]mportant constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability." Zadeh v. Robinson, 928 F.3d 457, 479-80 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part).

What about absolute immunity? Hawai'i has never endorsed absolute immunity for prosecutors outside of section 1983 claims.  See, e.g., Leong Yau v. Carden, 23 Haw. 362, 368 (Haw. Terr. 1916) ("Public prosecuting officers are entitled to protection against claims growing out of the discharge of their duties done in good faith though with erroneous judgment"); Orso, 56 Haw. at 247, 534 P.2d at 493 (absolute immunity does not apply to a prosecuting attorney for state torts).

Reconstruction Era common law also did not confer prosecutors with absolute immunity.  See, e.g., Scott A. Keller, Qualified and Absolute Immunity at Common Law, 73 Stan. L. Rev. 1337, 1366-67 (2021).  Not until 25 years after Congress provided a direct damages action against government officials to remedy constitutional rights did a court first say that prosecutors' unlawful acts are absolved by absolute immunity. See Griffith v. Slinkard, 44 N.E. 1001 (Ind. 1896).

We decline to expand state sovereign immunity for section 1983 claims to include county prosecutors.  We hold that county prosecuting attorneys and their deputies act on behalf of their respective counties when preparing to prosecute or prosecuting criminal violations of state law.

A county Prosecuting Attorney and/or Deputy Prosecuting Attorney acts on behalf of the <u>county</u> when preparing to prosecute and/or prosecuting criminal violations of state law.

| | |
|---|---|
| Carl H. Osaki<br>for appellant | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Ryan K. Thomas<br>for appellees | /s/ Todd W. Eddins |
| | /s/ Vladimir P. Devens |



Thomas J. Hughes
for amicus curiae
Attorney General of the
State of Hawai'i